Jack H. SCOTT, Edith L. Scott and Susan L. Scott, by Next Friend, Jack H. Scott, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 951.

United States District Court
M. D. Georgia,
Columbus Division.

Dec. 30, 1963.

L. B. Kent, Columbus, Ga., for plaintiffs.

Sampson M. Culpepper, Asst. U. S. Atty., Macon, Ga., for defendant.

ELLIOTT, District Judge.

This action is brought under the Federal Tort Claims Act, §§ 2671–2680 of Title 28, United States Code. This court has jurisdiction under § 1346(b), Title 28, United States Code. The cause of action asserted is based upon a claim for damages incident to injuries claimed to have been sustained by Edith L. Scott and Susan L. Scott by reason of alleged negligence in the operation of what is known as the "Hunt Club" which is located on the Fort Benning Military Reservation, Fort Benning, Georgia. The case was tried before the Court without a jury and was submitted by counsel for the respective parties on all issues of fact and law. This opinion is intended as compliance by the Court with the requirements of Rule 52, Federal Rules of Civil Procedure.

In 1956 a number of members of the United States Army stationed at Fort Benning, Georgia who either owned saddle horses or were otherwise interested for themselves or their families in the equestrian art and activities associated therewith, formed a voluntary association known as the Hunt Club. Army Regulations provided that activities of that nature which were organized, established and operated on the military reservation by individuals who were not acting within the scope of their official duties as members of the military establishment could exist only with the consent of the Post Commander. The Commanding General gave his consent for the establishment of the club and allowed it to use some land in a remote area of the reservation where once had existed a turkey farm upon which to construct such stables and other appropriate facilities as might be needed. He also permitted the club to use two or three small structures in the area which were remnants of the turkey farm.

The club began its operations under the provisions of a constitution and by-laws (adopted by the members of the club and approved by the Commanding General) which provided, among other things, that the club was to "be organized as a private association under the provisions of Paragraph 2(b) of AR 230–5 with the approval of the Command-

ing General, Fort Benning, Georgia."[1] The constitution further provided that the club "shall not operate as an instrumentality of the Federal Government", and that the club would "be responsible for the upkeep of facilities made available to it by the Commanding General", and that "repairs to these facilities necessitated by the operation of the Hunt (Club) shall be the responsibility of the Hunt" (Club). The purpose of the club was stated as follows: "The purpose of the Hunt Club is to provide facilities where members may maintain horses or ponies, and to provide regulated activities connected therewith". Membership in the club was to be open to all military personnel on the Post and such others as might be invited to become members who were not members of the military establishment. Dependents of military members were to have club privileges.

A Board of Governors directed the activities of the club. This Board and the club officers, consisting of a President, Vice President, Secretary-Treasurer and Stable Officer, were elected initially and

1. Paragraph 2(b), (c) and (d) of Army Regulation 230-5 entitled "Nonappropriated Funds and Related Activities" is as follows:

"2. Scope. a. * * *

"b. Private associations and funds thereof, organized, established, and operated by individuals acting not within the scope of their official capacity as officers, employees, or agents of the Government, and which are not established to provide essential morale and recreational facilities and services, are not subject to these and other departmental regulations governing nonappropriated funds as defined herein as instrumentalities of the Government. Such associations and funds thereof, except as otherwise provided by law or regulations, shall exist on a military installation only with the written consent of the installation commander. Such consent shall be contingent upon the following requirements and conditions as may be appropriate under the circumstances.

"(1) That programs and activities conducted do not prejudice or discredit the military services or other agencies of the United States Government.

"(2) That activities will not be conducted in the name of an installation or organization of the Army establishment.

"(3) That neither the Army, nor a nonappropriated fund defined in these regulations shall assert claim to the assets of any such association nor shall the Army or any nonappropriated fund incur any obligations on behalf of or assume any of the obligations of such an association.

"(4) That such associations will not engage in activities which are in conflict with authorized activities of nonappropriated funds defined in these regulations.

"(5) That the nature and authorized function of such associations, together with provision for proper disposition of residual assets and liabilities upon dissolution, will be established in their constitution and by-laws, charter, or articles of agreement.

"(6) That such associations are self-sustaining and receive no support assistance, or facilities from the Army or from nonappropriated funds defined in these regulations, except as provided for in AR 210-55, and AR 420-80.

"(7) That the installation commander has authority to enforce compliance by such associations with the conditions herein enumerated, to inquire into their activities, and to withdraw his consent for their existence on the installation if deemed necessary in the interest of the Government.

"c. The following funds are not subject to these regulations, but will be administered in accordance with other departmental regulations and directives specifically pertaining thereto:

"(1) Funds of Army Emergency Relief.

"(2) Central Hospital Fund.

"(3) Prisoner of war funds.

"(4) Patients' trust funds.

"(5) Prisoners' personal deposit funds.

"(6) Funds established for civilian employees at civil works activities of the Corps of Engineers, Department of the Army.

"(7) Funds established for contractors' employees at contractor-operated installations.

"d. The provisions of these regulations are not applicable to the establishment, administration, supervision or control of the activities and related funds of labor union locals, posts of veterans organizations, or to credit unions. Responsibilities of commanders with respect to labor union locals and posts of veterans organizations are contained in CPR E6. Provisions governing the establishment and operation of credit unions are contained in CPR A2.

have since been elected annually by the club members.

All members of the club were required to pay an initiation fee of $20.00 and dues thereafter of $1.00 per month. The club prospered and built twenty-five permanent block stalls for horses, a tack room and a room for hay storage and two riding rings. In 1959 twenty-five additional temporary stalls were constructed, the materials being purchased by the club from a wrecking company in nearby Columbus, Georgia, and the actual work of construction being done by club members in off-duty hours. Mounts owned by club members were quartered for a monthly fee and the club purchased about twenty additional horses which were available for rent on an hourly basis. The club also engaged a riding instructor and an hourly charge was made for instruction. Veterinary service was provided by an off-Post veterinarian who was engaged by the club.

The club had no restaurant, bar, game room or other recreational facility. Occasionally the club members would have a picnic or a barbecue in the area, but the principal purpose for the club's existence was the stabling and riding of horses. The income derived from rentals and instruction was used to buy feeds and otherwise maintain the horses which the club owned and to buy saddles and bridles for the club-owned horses and to pay salaries, utility bills and other incidental expenses incurred by the club. The club kept its own books and maintained a bank account.

The Army never contributed any money or property to the club and under the provisions of the constitution the club members are subject to assessment if the income of the club is not adequate to pay expenses. Such assets as may be owned by the club if and when it is eventually dissolved will be distributed among the club membership. There have been times in the past when the club was sponsoring a horse show when members obtained the temporary use of some seating equipment in the nature of bleachers and some loud speaker sound equipment which was Army property for which the Army made no charge to the club. It also appears that there have been occasions when Army trucks have hauled wood shavings and sawdust to the club's stable area. In general, however, the club has been self-sustaining.

The constitution of the club provides that it shall be the duty of the Board of Governors to "act on" any matter called to its attention by the Commanding General, but the record indicates that no such occasion has ever arisen. Being responsible for everything at the Post, the Commanding General does require the club to submit its financial records to his accounting representative for monthly audit, as is required of all nonappropriated funds regardless of whether they are or are not considered by the Army as being instrumentalities of the Government.

On May 17, 1961 Jack H. Scott, at that time a Captain in the United States Army stationed at Fort Benning, was a member of the Hunt Club and owned a horse stabled at the club. His wife, Edith L. Scott, and his daughter, Susan Scott, were his dependents and entitled to use the club facilities. On that date Edith L. Scott and Susan Scott went to the club and Susan rode the Scott horse. After riding the horse Susan tied the horse to a hitching post and she and Mrs. Scott proceeded to "brush the horse down". While being thus tied, the horse pulled his head back in such manner as to put pressure on the reins, pulling the post back toward the horse and causing the post to fall upon both Mrs. Scott and Susan, inflicting injuries upon them.

It is clear that the hitching post which fell was erected and maintained by officers and employees of the Hunt Club and the complaint alleges that the Hunt Club was such an instrumentality of the United States Army as to make it a "Federal Agency" within the meaning of the Federal Tort Claims Act and that the hitching post was insecurely, inadequately and improperly erected and negligently maintained in the circumstances and that

such negligence was the proximate cause of the injuries sustained. The Defendant contends that the Hunt Club is not a "Federal Agency" and further, that even if it is such an agency there has been no showing of any violation of any duty owed to the complainants so as to make the United States liable.

The Federal Tort Claims Act consents to suits against the United States for injury to or loss of property or for personal injuries or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

The term "employee of the Government" includes officers and employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.

"Federal Agency" includes the Executive Department and independent establishments of the United States and corporations primarily acting as instrumentalities or agencies of the United States.

■ The crucial question involved here is whether the Hunt Club is a "federal agency" within the meaning of the Act.

■ The Hunt Club is an association of individuals in their private capacities. The funds with which it operates are privately owned. No appropriated funds of the United States are used. It is what is known as a nonappropriated fund activity. Nonappropriated funds have long been been associated with the military services. They are of many types, serve many purposes and are established and operated in various ways. It cannot be stated categorically that *all* nonappropriated fund activities are instrumentalities of the United States. Neither can it be said that *none* are. Each must be judged in the light of the particular circumstances surrounding it.

■ There can no longer be any doubt that nonappropriated fund activities such as post exchanges, ship's service stores, commissaries and messes are integral parts of the military establishment and that the Government is liable for negligence in their operation. It has been so held in Standard Oil Company of California v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942) (Army post exchange); in Aubrey v. United States, 103 U.S.App.D.C. 65, 254 F.2d 768 (1958, USCA, District of Columbia) (Navy officers mess); in Grant v. United States, 271 F.2d 651 (1959, 2nd Cir.) (ship's service store); and in United States v. Holcombe, 277 F.2d 143 (1960, 4th Cir.) (Navy officers mess).

■ The reasoning of the Supreme Court in Standard Oil Company of California v. Johnson and the cases following it was that exchanges were established under regulations of the War Department, were completely controlled in their operation by Army regulations, managed by Army officers as part of their official duties, and although the Government assumed none of the financial obligations of the exchange, the profits are utilized for general welfare and recreational activities for the benefit of all soldiers served by the exchange. From all this the Court concluded:

" * * * that post exchanges as now operated are arms of the government deemed by it essential for the performance of governmental functions. They are integral parts of the War Department, share in fulfilling the duties entrusted to it, and partake of whatever immunities it may have under the Constitution and federal statutes."

We judge the meaning of this decision to be that for an Army nonappropriated fund activity to be a "federal agency" within the meaning of the Federal Tort Claims Act it must be an *integral part* of the Army, charged with an essential

function in the operation of the Army, and the degree of control and supervision by the Army must be more than casual or perfunctory.

When it has appeared that there has been a marked degree of Government direction, maintenance, supervision and control the doctrine announced in the Johnson case has been extended to embrace such activities as bowling alleys and swimming pools. Rizzuto v. United States, 298 F.2d 748 (1961, 10th Cir.); Brewer v. United States, 108 F.Supp. 889 (U.S.D.C., Ga., 1952).

The only "club" case which has come to our attention is United States v. Hainline, 315 F.2d 153 (1963, 10th Cir.), and the complainants in the case now before us contend that there is sufficient similarity between the facts of this case and the Hainline case to warrant the adoption of the ruling in the Hainline case as being a precedent for a favorable decision for the complainants in the instant case. In Hainline the Appellate Court affirmed the view of the Kansas District Court that an "Aero Club" established at McConnell Air Force Base was an instrumentality of the Government and that the United States would be liable under the Federal Tort Claims Act for the negligence of club employees (reversed on other grounds with which we are not here concerned). The relevant facts involved in that determination are not fully set forth in the reported opinion and because of surface similarity we have obtained and have reviewed the complete record in the Hainline case and find the pertinent details to have been as follows: In 1957 a group of Air Force personnel then stationed at McConnell Air Force Base formed a private club to acquire and have available light aircraft for the use of club members during off-duty hours. This was done with the consent of the Base Commander and the club operated in that manner for about two years. On April 14, 1959 the Secretary of the Air Force issued an Air Force Regulation identified as AFR 34–14 which made comprehensive provision for the establishment and operation of Air Force Aero Clubs. It dealt with that subject only. This regulation authorized commanders to establish Air Force Aero Clubs which would be operated as nonappropriated fund activities, told them how to establish such clubs and specified what controls the commanders should place on the operation of the clubs and how the operations should be supervised by the commanders.

Paragraph 2 of this Air Force regulation is as follows:

"2. *Purpose of Aero Clubs.* Aero Clubs are designed to stimulate an interest in aviation; to provide authorized personnel with an opportunity to engage in flying as a recreational activity; and to encourage and develop skills in aeronautics, navigation, mechanics, and related aero sciences useful to the Air Force mission."

Paragraph 3 is as follows:

"3. *How to Establish Aero Clubs.*

"a. Major air commanders may approve the establishment of aero clubs as sundry fund activities in keeping with AFR 176–1 to operate as instrumentalities of the Federal Government under the auspices of the Air Force.

"b. An Air Force aero club must organize under a constitution or charter and by-laws which provide for its operation and dissolution consistent with this and other applicable regulations.

"c. An Air Force aero club may carry the name of its base location; for example, a club formed at Randolph Air Force Base may be known as the 'Randolph Air Force Base Aero Club.'

"d. Local policies and regulations may be issued to insure that clubs operate smoothly, efficiently, and properly, provided the policies and regulations are consistent with this and other applicable regulations."

Paragraph 4 directs that membership shall be limited to active duty military personnel, but that dependents, retired

personnel and civilians employed by the Air Force may be associate members under certain conditions.

Paragraph 6 provides that commanders will supervise club operations to insure that: (paraphrasing) (a) Appropriate operational and administrative procedures are established and followed; (b) The club maintains an effective air-ground safety program; (c) The club operates on a self-supporting basis in a businesslike manner and to insure the club fund accounting procedures are consistent with Air Force manual requirements; (d) Coordination and proper working relationship is established and maintained with the local FAA; (e) Air Force equipment is made available for use by club members when possible to assist them in maintaining and repairing aircraft; (f) The sale of petroleum products is conducted in accordance with Air Force regulations.

Paragraph 7 provides that:

"Aero clubs organized under provisions of this regulation operate as instrumentalities of the Federal Government under the auspices of the Air Force. As such, the Air Force may loan to aero clubs light aircraft not immediately required for military purposes."

The regulation then goes on to specify the manner and terms under which aircraft and aircraft parts which are the property of the Air Force may be loaned to Aero Clubs and Paragraph 8 of the regulation sets forth the rules which must be observed by Aero Clubs in using aircraft on loan from the Air Force and how such loaned property will be accounted for.

Paragraph 11 discusses the insurance that must be carried by Aero Clubs, but with respect to liability insurance the regulation states that:

"Inasmuch as aero clubs are classified as nonappropriated fund activities, commercial public liability insurance is not required."

This provision regarding public liability insurance above quoted from Paragraph 11 of the regulation ties in with Paragraph 13 of another Air Force regulation identified as AFR 176–8, which specifies that:

"A nonappropriated fund activity may not obtain public liability insurance (or protection against losses arising out of personal injury, death and property damage) * * * from a commercial insurance carrier except in some foreign countries * * *. Any tort claims resulting from acts or omissions of employees of a nonappropriated fund activity will be reviewed and settled administratively as outlined in Paragraph 14."

The clear implication of the provisions of Paragraph 11 of AFR. 34–14 when viewed in conjunction with the provisions of Paragraph 13 of AFR 176–8 is that insurance is not required because it is recognized by the Air Force that the Aero Clubs are Government instrumentalities and that any valid claims would be taken care of accordingly under the provisions of the Federal Tort Claims Act.

In this setting, shortly after the issuance of AFR 34–14 above quoted, the Commander of McConnell Air Force Base, on June 1, 1959 issued an order establishing the "McConnell Air Force Base Aero Club" and in that order the Base Commander specified by name the personnel under his command who were appointed as members of the Board of Directors of the Aero Club. He not only specified who should be members of the Board, but he also designated by name who should be President, Vice President, Secretary and Treasurer. The club was established as a nonappropriated sundry fund activity. It then ceased to be a private organization and its assets and liabilities were transferred to a sundry fund account which was under the control of the Central Accounting Office at the Base and its books were kept and its accounts were thereafter carried as ledger accounts in the Base Central Accounting Office. The club does not receive any money from

the Air Force, its funds coming from dues, rentals, charges for flying instruction, sale of spare parts and gasoline to transient aircraft, etc., but the Air Force lent three airplanes to the club. The club acquired other planes by purchase. When the Aero Club buys a plane the purchase contract is approved by the Board of Governors of the club and it is also necessary that it be approved by the Base Commander.

As it was required to do under the Air Force Regulation and under the terms of the Base Commander's order establishing it as a sundry fund, the Aero Club adopted a constitution to govern its operations and Article I of this constitution is as follows:

"By authority of the Commander, Second Air Force, and under the provisions of Air Force Regulations 34–14 and 176–1 and SACM 34–3, the McConnell Air Force Base Aero Club, hereinafter referred to as the Aero Club, is established as a sundry fund. The Aero Club will operate as an instrumentality of the Federal Government and is entitled to all the privileges, rights and immunities of a Government instrumentality."

Other articles in the club's constitution set out that the purpose of the club is to develop skills useful to the Air Force mission, the finances shall be subject to constant supervision by the Base Commander and any indebtedness incurred in excess of a specified amount must have the prior approval of the Base Commander, liability protection is provided by the government in accordance with Regulation 176–8, a copy of the minutes of all meetings must be forwarded to the Base Commander, neither the constitution nor the by-laws may be amended without the approval of the Base Commander, and upon dissolution of the club the residual assets of the club, if any, will be disposed of as prescribed by applicable Air Force Regulations.

Just as the Army has a basic regulation identified as AR 230–5 which deals with nonappropriated funds and related activities, the Air Force has its regulation identified as AFR 176–1 dealing with the same subject. The two regulations are quite similar and the Air Force Regulation sets up the categories of such funds in a manner similar to that used by the Army. Paragraph 9 of AFR 176–1 describes nonappropriated funds and activities which are not deemed to be Government instrumentalities and not intended to be covered by this regulation in a manner almost identical to the provisions of Paragraph 2(b), 2(c) and 2(d) of Army Regulation 230–5 heretofore quoted in footnote 1 of this opinion, making it clear that the Air Force Regulation contemplated the existence of private organizations on the Base which would not be instrumentalities of the Federal Government just as the Army Regulations do, but the Air Force chose deliberately to take Aero Clubs out of the category of private organizations and bring them under the provisions of a special regulation which specified that they were henceforth to be Government instrumentalities.

It was on the basis of the foregoing facts that the Kansas District Court in the Hainline case concluded that the Aero Club was an integral part of the Air Force and as such was a Government instrumentality. A review of the facts heretofore recited with regard to the Hunt Club clearly indicates that here we have a horse of a different color.

The Hunt Club began its operations as a private association and there has been no directive of any nature issued changing its status. The Army regulation under the terms of which it was allowed to come into existence specified that the club was not subject to the general regulations governing nonappropriated funds which are instrumentalities of the Government. The constitution of the club recited that the club was being organized as a private association and that it was not to be operated as an instrumentality of the Government. The activities of the club did not develop skills useful to the Army mission (there is no cavalry unit located at Fort Ben-

ning). The Army did not give or lend any horses to the club. The Commanding General did not appoint the Board of Governors of the club nor did he appoint the officers of the club, all of these being elected by the members. The club keeps its own books and maintains its own bank account. The Commanding General does not dictate any rules or regulations governing the detailed operation of the club. Contracts for the purchase of horses or other equipment do not require the approval of the Commanding General. Members are subject to assessment and upon dissolution of the club the assets will be distributed among the members of the club. There is no special Army regulation which has authorized the establishment of Hunt Clubs. There is no Army regulation which specifies that Hunt Clubs are instrumentalities of the Government. There is no Army regulation which provides that claims for damages asserted against the club will be treated administratively under the provisions of the Tort Claims Act. To summarize, every action taken by the Army at Fort Benning with relation to the Hunt Club and every action taken by the club itself has been consistent with the Defendant's position that the Hunt Club is not an integral part of the Army nor an instrumentality of the Government, whereas, on the other hand, every action taken by the Air Force at McConnell Air Force Base and every action taken by the Aero Club there has been consistent with the position of the Plaintiff in the Hainline case that the Aero Club was recognized and was being supervised as an integral part of the Air Force and was intended to be treated as an instrumentality of the Government.

Everything considered, we find that the Hunt Club at Fort Benning is not an integral part of the Army charged with an essential function in the operation of the Army and that there is not that degree of control and supervision by the Army necessary to classify it as a federal agency. We therefore, conclude that there can be no liability on the part of the Defendant for the claimed negligent operation of the Hunt Club. This view makes it unnecessary for us to consider the other questions presented. Judgment for the Defendant will be entered accordingly.